# UNITED STATES FIDELITY AND GUARANTY COMPANY *vs.* CROWN CORK AND SEAL COMPANY.

*Fidelity Insurance—Defalcations of Employees—Schedule Bond—Construction.*

A "schedule bond" of insurance, by which an employer was indemnified against losses caused by the dishonesty of employees named in a schedule, in amounts varying from period to period for each employee, with a proviso that "the insurer's aggregate liability under all its bonds and engagements on any one employee shall not exceed the largest bond or engagement on such employee," *held,* on a construction of the language used, not to relieve the insurer, after its payment of loss caused by an employee's defalcation in one period, from liability for his defalcation in a subsequent period, during which the amount of insurance was less than the payment previously made by it.

*Decided April 10th, 1924.*

Appeal from the Baltimore City Court (FRANK, J.).

Action by the Crown Cork and Seal Company of Baltimore City against the United States Fidelity and Guaranty Company. From a judgment for plaintiff, defendant appeals. Affirmed.

The cause was argued before THOMAS, PATTISON, OFFUTT, and DIGGES, JJ.

*Edgar Allan Poe,* with whom were *Bartlett, Poe & Claggett* on the brief, for the appellant.

*Arthur W. Machen, Jr.,* and *Roger B. Williams,* with whom were *Hershey, Machen, Donaldson & Williams* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

This appeal involves the construction of what may be called a "schedule bond," that is a bond of insurance in which the insurer, in consideration of the payment of certain premiums, undertakes to indemnify the assured up to a designated amount, during a term which may be fixed or uncertain, against loss occasioned through the fraudulent or dishonest conduct of employees whose names appear in a schedule, which is a part of the insurance contract.

The facts are undisputed and in part are very concisely and clearly stated in this extract from the appellant's brief:

"The bond sued on, styled a schedule bond, was originally issued in May, 1918, and was unlimited as to its duration. It was intended that employees of the Crown Cork and Seal Company would be listed under it from time to time in varying amounts as to liability and that the extent of the liability as to each employee so listed might also be increased or diminished from time to time, the premiums to be paid upon these various and varying risks to be calculated upon a certain basic annual rate, to wit, 25 cents per $100 of insurance. As changes occurred either in the identity of the employees or in the amount of insurance upon an employee, proper premium adjustments were made. There was no renewal of the original bond, but the bond was simply continued in force from year to year upon payment of the premiums called for thereby.

"One John Doe, an employee of the appellee, whose misappropriations have given rise to this suit, was covered by this schedule bond for a number of years in varying amounts, as follows:

"From January 20, 1919, to March 15, 1920, $20,-000.

"From March 15, 1920, to March 1, 1922, $25,000.

"From March 1, 1922, to December 14, 1922, $10,-000.

"On this latter date it was discovered that he was an embezzler and he was immediately discharged. An examination of his accounts showed that between Jan-

uary 19, 1919, and December 14, 1922, he had embezzled $27,537.29, of which sum $13,079.82 was embezzled between May 4, 1921, and March 1, 1922, and $14,459.47 between March 1, 1922, and December 14, 1922. The appellant admitted its liability for $13,079.82 and promptly paid that sum to the appellee. It denies liability as to the $14,459.47 or any part thereof."

The policy or bond of insurance was executed on May 28th, 1918, and contained among other things these provisions:

"The United States Fidelity and Guaranty Company, as insurer, for a premium based upon an annual rate per one hundred dollars of insurance, hereby guarantees to pay to the Crown Cork and Seal Company, the employer, such pecuniary loss as the employer shall sustain (limited only by the provisions hereof) of money, bonds, debentures, scrips, certificates, warrants, transfers, coupons, bills of exchange, merchandise or other property, including that for which employer is responsible, occasioned by any act or acts of fraud, dishonesty, forgery, theft, larceny, embezzlement, wrongful abstraction or misapplication or misappropriation or any criminal act by any of the employees listed hereunder directly or through connivance in any position and at any location in the employer's employ and during the period commencing upon the date each is listed hereunder and continuing in the amounts named until the termination of this insurance, and discovered within twenty-four months after the termination of this insurance on behalf of such employee or employees.

"Provisos:

"1. On application, other employees may be added hereto from time to time by the insurer issuing an acceptance in writing, stating the amount and the date added, and this insurance on any employee may be increased or decreased by the insurer without impairing the continuity hereof, provided the insurer's aggregate liability under all its bonds and engagements on any one employee shall not exceed the largest bond or engagement on such employee."

The "premium year" ran from June 1st in any given year during the life of the policy to June 1st in the following year, and, to quote from the agreed statement of fact, whenever an employee was added between said dates to the aforesaid list of employees covered by said policy, a proportionate fractional part of the agreed-on premium was paid to cover the fraction of the year until the next succeeding June 1st. A short time prior to June 1st of each year during the existence of said policy, the defendant would mail to the plaintiff notice of premium that would be due on the succeeding 1st of June. The "notice" referred to contained this provision:

"It is understood that the United States Fidelity and Guaranty Company of Baltimore, Maryland, does not assume liability during any year or years, or for any default or defaults in the aggregate exceeding the amount of its suretyship as determined by the original obligation of suretyship."

John Doe, an employee of the insured, was first listed on the schedule which formed a part of the insurance contract on January 20, 1919, for $20,000, which amount was changed from time to time as indicated above in the manner provided in the policy.

As has been stated, the insurance company denied any liability for losses which occurred through the defalcation of the insured's employee, John Doe, subsequent to March 1st, 1922, upon the theory that, as it had paid for all losses occurring during the whole period that the bond or engagement on that employee was fixed at $25,000, that it was not liable for further losses occurring through the defalcation of such employee after that amount had been reduced to $10,000, because "it never issued but one bond; that the annual payment of premiums and the periodical adjustment of premiums merely continued the original bond in force from period to period subject to all of its original terms and conditions."

The assured, refusing to accept this theory, brought suit on the bond in the Baltimore City Court, where it was tried before the court on an agreed statement of fact under sec-

tions 54 and 55 of article 75 of Bagby's Code, Public General Laws of Maryland, and at the conclusion of that trial the court entered a judgment for the plaintiff for $10,355, in accordance with these provisions of the agreed statement of fact:—

> "If the court shall be of opinion that upon the aforegoing facts the plaintiff is, by the true construction of said policy, entitled to recover the amount embezzled by said John Doe after March 1st, 1922, not exceeding, however, ten thousand dollars ($10,000), in addition to the said sum of thirteen thousand and seventy-nine dollars and eighty-two cents ($13,079.82) paid, the court shall enter judgment against the defendant in favor of the plaintiff for ten thousand dollars ($10,000) and costs, with interest in the discretion of the court from the fifth day of April, 1923, but if the court shall be of opinion that the defendant is not liable for the amount embezzled by the said John Doe after March 1st, 1922, then judgment shall be entered for the defendant for costs. From such determination either party aggrieved thereby shall have the right to appeal to the Court of Appeals."

From that judgment this appeal was taken, and, as will be seen, the only question it presents is whether the appellant is liable to the appellee for losses occurring in each premium period up to the amount of insurance in force during such period on the employee whose conduct is the basis of the claim, not exceeding in the aggregate "the largest obligation for any single period, during which the employee is listed and during the life of the bond." *Opinion Baltimore City Court.*

In dealing with that question, it may be said at the outset that the phraseology of the bond is needlessly obscure, since the purpose it was designed to effect was plain and single. That purpose was to insure the appellee for a certain period against loss through the dishonesty of its employees. If it was intended that in the event of losses through the contingencies contemplated by the bond, occurring through two or

more periods which were measured by variances in the amounts of insurance, that the insurer, having paid the loss occurring in one period, should not be liable for any losses occurring in a subsequent period or periods in which the amount of insurance was less than what it had so paid, that intention could and should have been expressed in less ambiguous language than that employed in the bond.

Certainly no such intention is conveyed by the phrase "provided the Insurer's aggregate liability under all its bonds and engagements on any one employee shall not exceed the largest bond or engagement on such employee." Nor by the mere fact that the bond was in a sense a continuing bond. For whatever the language we have quoted may mean, there is nothing in it to indicate that by it the insurer meant to say that, having once paid a loss due to the defalcation of an employee in any given period, it would not thereafter in any period, subsequent to a change in the amount of insurance on the defaulting employee, be liable for a loss, occasioned through conduct of that employee covered by the policy, up to the amount of insurance in force during the period in which the later defalcation occurred.

The language referred to may be variously construed. The appellant contends that it means that if it had, in addition to the insurance named in the schedule bond, written other bonds or policies on some individual covered by the schedule bond, that its aggregate liability under both bonds would be limited to the largest amount named in either. That it did intend that is not probable, for even if it had the power to do so, in the absence of some express declaration of such an intention, we would not assume that it intended in the schedule bond to restrict its power to make such other bonds in reference to individuals covered by it, as future exigencies might require.

It may have the meaning given it by the learned judge who tried the case below, that is, that : "The defendant is liable for the amount of any defalcation in each period, not exceeding the limit assumed for that period, but the aggregate liability for all periods must not exceed the largest obligation

for any single period, during which the employee is listed and during the life of the bond," which is also the meaning given to it by the appellee. Or it could mean that the insured's liability for any accumulation of losses occurring in several periods should be limited to the amount of insurance named in the largest bond or, if effect is given to the provision of the premium notice referred to above, that such liability would be limited to the amount of its "suretyship as determined by the original obligation of suretyship." Both parties agree that the language under consideration is beyond question clear, explicit and unambiguous, but each also contends that it means a diametrically different thing. In view of what has been said, we do not ourselves regard it as free from doubt and will therefore resort to its context, and to the objects and purposes which the parties to the contract proposed to accomplish by it, and to their apparent intention concerning those objects and purposes, as manifested by the whole instrument, to ascertain its true meaning.

As has been said, the bond was in a sense continuing. That is, it was continuing as to the general plan or scheme contemplated by it, to wit, to indemnify the insured against losses occurring through the dishonesty of such employees as were designated in the accompanying schedule, but as to the several individual employees named therein it was not continuing. The amount of the premium payable upon the whole policy was constantly changing, the amount of the obligation or engagement with respect to the several employees was from time to time increased or decreased, and changes were from time to time made in the personnel of the employees named in the schedule. As to such employees, considered severally, the bond must itself be regarded as several, and separate as to each, and as to each continuing only so long as the engagement or obligation as to him remained unchanged. And the liability of the insurer, therefore, with respect to any one employee named must be measured by the amount of insurance in force on such employee during the period in which such amount remained unchanged. And where losses occurred in separate periods it would be

liable up to the amount of insurance in force in each period respectively, subject to the limitation referred to above.

In arriving at this conclusion we have not considered whether renewals of such a bond as the one under consideration constitute separate contracts, because that question is technically and strictly not pertinent to the inquiry, since with each change in the amount of insurance an old contract was not renewed, but a new contract was made.

This conclusion appears inevitable from the very nature of the acts with which we are dealing. The appellee was buying and the appellant was selling a form of protection. For that protection the insured paid at the rate of twenty-five cents per hundred dollars of indemnity per annum. At the end of any year it could have terminated the current contract of insurance or indeed at any time, and could have procured a new bond from the insurer. In that event it could not well be said that the insurer would not have been liable on each bond for losses during each of the periods respectively covered by such bonds and in effect that was just what was done as to each employee named in the schedule bond. But if the appellant's contention that, after it paid $13,-079.82 for losses occurring prior to March 1st, 1922, when the amount of the bond was $25,000, it was not liable for losses occurring in the subsequent period when the bond was only $10,000, is correct, then the insured was paying for what he did not receive. Such a construction is forced, unsubstantial and unreasonable, for if the insured believed that under the policy he was receiving no protection against losses occurring after March 1st, 1922, it is not likely that he would have continued to pay the same premiums he had paid when he did receive such protection. Nor can it be assumed that the insurer so understood it, because it must have known that it could not readily sell insurance on such terms. We do not mean to say that an insurer could not limit its liability for an accumulation of losses as this company has done in its premium notice, but that under this bond it was not intended that the insured should pay for protection which it did not receive, as would be the case if appellant's contention is cor-

rect.  For although the insured had paid the premiums on a
bond of $10,000 from March 1st, 1922, to June 1st, 1922,
and from June 1st, 1922, to December, 1922, yet it contends
that it is responsible for no losses occurring after March 1,
1922.  Without further prolonging this opinion it follows
from what we have said that in our opinion there was no
error in the ruling of the trial court, and the judgment ap-
pealed from must be affirmed.

*Judgment affirmed, with costs to the appellee.*